### UNITED STATES HOFFMAN MACHINERY CORPORATION v. MASTER MACHINERY CORPORATION et al.

District Court, S. D. New York.

Aug. 5, 1931.

Charles Neave and Maxwell Barus, both of New York City, for plaintiff.

Meyers & Jones, of New York City (J. Granville Meyers, C. H. Jones, and T. J. Johnston, all of New York City, and Allen & Allen, of Cincinnati, Ohio, of counsel), for defendants.

FRANK J. COLEMAN, District Judge.

In this suit to restrain the infringement of two patents, the only questions presented are whether they are invalid for want of invention. Those questions have already been decided in the affirmative by the Circuit Court of Appeals for the Third Circuit upon a record identical with this one, in an action brought by the same plaintiff against other defendants, where the complaint was dismissed; and the Supreme Court has denied a writ of certiorari. U. S. Hoffman Machinery Corp. v. Pantex Pressing Machinery, Inc. (C. C. A.) 44 F.(2d) 685; 282 U. S. 904, 51 S. Ct. 217, 75 L. Ed. 796. Instead of taking testimony in the present suit, the parties stipulated in evidence the entire record on appeal in the Third Circuit, which raised only the same questions, viz., whether the improvements covered by the two patents amounted to invention.

Both patents relate to garment-pressing machines, or, more specifically, to means for drying the garment during the operation. The machines are those commonly seen in tailoring establishments, consisting of two principal parts, a metal buck upon which the garment is laid and a metal head which moves down and covers the buck, pressing the garment between them. Moisture and heat must both be present at the time the pressure is exerted, and for this purpose steam is used to heat the head and the buck, and to be sprayed upon the garment from the head or from the buck. When the pressure has been released and the head raised, the garment cannot be handled until it is dry without spoiling the effect of the pressing. The garment would, of course, dry of itself if merely left long enough on the buck, but that would be impractical because of the waste of time and because in a slow drying the creases are to some extent lost.

It is therefore essential in a commercially successful machine to provide some way of accomplishing a quick drying of the garment. The importance of this may be seen from the fact that in pressing one suit forty or fifty different "lays" are required, and, if only a few seconds are lost after each, there is a very substantial difference in the quantity of daily work done by the machine and its operator, in addition to a poorer quality due to the slow drying.

The original machine of this type was invented in 1892, and it was defective because of its inadequate means for drying the garment. It sprayed the steam through perforations in the buck, and thus the garment had to be thoroughly saturated in order to bring sufficient moisture to its upper surface where the hot head was applied. The only means provided for drying was the heat of the head, and a too prolonged application of this gave the garment a shine, which, of course, was undesirable. It is undisputed that the original idea was not a commercial success, which may have been due to this defect.

There was no further advance in the art till 1904, when Hoffman obtained a patent (No. 928,199) for a similar machine, except that the steam was sprayed on the garment through the head instead of through the buck. The effect of this change was to reduce very greatly the amount of moisture put into the garment because it was applied directly on the surface where it was needed, adjacent to the heated head, instead of saturating the entire thickness of the garment from the buck. Hoffman provided no means for drying ex-

cept the heat of the head, but, since so little moisture was used, this proved fairly satisfactory. His patent stressed the fact that quick drying would result from supplying the steam spray through the head, and apparently the trade found it so, because his machines had a marked commercial success.

Hoffman's idea, however, was only a partial solution of the quick-drying problem, because to remove even the small quantity of moisture the head had to be kept in contact with the garment longer than the time needed for mere pressing. Not only was some time lost in drying each "lay," but there was a large chance of producing a shine if the time was not expertly gauged. For that reason the commercial success was distinctly less than it would have been.

Thereafter the trade made repeated efforts to find other solutions of the problem, and in the eleven years between Hoffman's patent and the application for Weinberger's patent (one of the two in suit) no less than eight patents were issued in this country which disclosed new methods of shortening the drying period. (Hoffman No. 939,025, filed in 1908; Hoffman No. 897,832 filed in 1905; Rowland reissue No. 14,090, filed in 1911; Lasance No. 1,014,011, filed in 1911; Todd No. 1,038,686, filed in 1911; Palmer No. 1,105,530, filed in 1911; Palmer No. 1,141,-900, filed in 1910; Sanborn No. 1,169,873, filed in 1913.) Most of these adopted the fundamental idea of reducing the amount of moisture supplied to the garment, rather than of affirmative means of removing it, and therefore provided various methods for drying the steam before spraying; but some of them disclosed new means for applying heat to the garment after the spraying so as to accelerate the removal. None of them, however, suggested the solution at which Weinberger arrived. While it is true that these patents were mostly designed for machines which sprayed from the buck, in order to avoid conflict with the Hoffman patent, one of the purposes for which the inventors were striving was a shortening of the time of drying.

Weinberger conceived the idea of accelerating the drying by passing a current of air through the garment as it lay on the buck after the pressure was released; and in his application, filed June 1, 1915, disclosed a suction device attached to the buck with a valve operable at will, so that a current of air might be drawn down through the garment and through the top of the buck at any time the operator desired, but preferably as

soon as the pressure of the head was released. The drying effect of the current shortens the time that the head must be kept in contact with the garment to the period required for the mere pressing, and obviates the danger of producing a shine. The great practical value of the idea is amply proved, not only by the test made in court, and the testimony of such users as Zorn, but by the undisputed popularity it has attained in the trade.

The question presented is whether this idea, in view of the prior art, involved the exercise of an inventive faculty, or whether it was only what an ordinary skilled workman would have conceived. It is undisputed that no one of the numerous skilled workmen making and using these machines had ever, even remotely, suggested it, though there was a very strong incentive and apparently continuous effort to shorten the time of drying. The period from the invention of the original machine was twenty-three years, and even if, as the defendants contend, they were not in commercial use till 1904, there would still remain eleven years during which various makes of machines were on the market and in active use. During that period the total result of the efforts to solve the problem was the eight ineffectual patents above cited; though the trade has seized on the Weinberger solution with such avidity that it is extremely difficult to sell a machine which does not embody it.

The defendants contend, and the Court of Appeals of the Third Circuit has accepted their argument, that the prior use of suction devices for drying purposes in machines employed in other trades, such as hat making, laundering, etc., prevented Weinberger's valuable contribution from having the status of invention. It must, of course, be recognized that Weinberger makes no pretension of having discovered the principle that a current of air will accelerate the drying of a fabric, which was probably thoroughly understood from the first time that a family wash was hung out of doors. His contribution was an application of that principle to the solution of a problem of saving a few seconds of time on each operation of the machine and of preventing shine on the garment.

The nearest approach to the garment-pressing machine was one used in the laundering trade, patented by Hagan and Cooper in 1910 (No. 962,213), which had a means for blowing or sucking air through the pad affixed to the top of the buck so as to obviate the necessity of frequently changing the pad as it became saturated with moisture from the linen cuffs which were being ironed. In an opinion holding that the Weinberger device did not infringe the Hagan and Cooper patent, the Circuit Court of Appeals for this circuit points out the substantial difference in the purpose and use of the two air currents. American Laundry Machinery Co. v. Hoffman Company (C. C. A.) 271 F. 856. The patent does say that the cuffs would be finished dryer on account of the device, but that would be so only indirectly and because the pad would be kept dryer.

Probably the next nearest approach to the Weinberger idea was in the hat-making machine disclosed by Tracy in application for patent No. 1,214,846, filed in 1913. This had means for causing a current of air (by either suction or blowing) to flow through the mould in which a felt hat was shaped, and, to some extent, through the felt itself, for the purpose of carrying off moisture without the necessity of applying heat which would stiffen the felt. The moulding was a comparatively slow process, in which a matter of a few seconds such as Weinberger considered was immaterial.

The other instances cited were too remote to require detailed mention. In none of them, nor in the two above considered, was the current employed for the brief and rapidly repeated effect sought by Weinberger. Of course, in all of them the general purpose was drying, but the particular purposes to be served and the particular manner of applying the current were different in the garment press.

During the first ten years after the issue of Weinberger's patent, the trade accorded it substantial respect. In that period only one concern undertook to infringe it, and the circumstances of that were such as, perhaps, to deprive it of significance. This treatment of the patent by the trade, however, may be laid out of account in arriving at a conclusion as to its validity, because it may have been caused to some extent by the hold which the Hoffman patent had on the trade.

■■■■ If the question were before this court in the first instance, I would unhesitatingly find that Weinberger's contribution amounted to invention. Under all the circumstances, the trade's prior failure to think of a device which it now prizes so highly compels an inference that it involved invention, unless, indeed, the matter is to be left in the realm of "wonder." While other trades had previously employed the same principle, the possibility and the method of its application to the solution of the problems presented by gar-

ment-pressing machines could not have been apparent to a man skilled in the art.

A more difficult aspect of the question is what effect should be given to the decision of the Circuit Court of Appeals in arriving at a finding. There is, of course, no binding effect, and the persuasiveness of the decision is decreased by a recognition of the fact that it represents the views of only two out of the four judges of that circuit who passed on the case. The dissenting Circuit Judge and the trial judge agreed with the Patent Office in finding invention. However, purely as a matter of policy and for the purpose of uniformity, that decision should be followed, especially since the records are identical, if any doubt remained as to the correct finding. With the utmost deference for that high court and with full appreciation of my own proclivity to error, it must be stated that no doubt remains in my mind, and that therefore this court must hold the Weinberger patent valid.

■ The other patent in suit, Spencer No. 1,326,982, was applied for two weeks later than the Weinberger patent. Spencer adopted the Weinberger idea of a suction device attached to the buck, but provided that the suction be supplied by a steam ejecter instead of a pump as suggested by Weinberger, and, further, that the ejector be operated from the same source of steam as supplied the heat and the steam spray for the machine. The steam ejector was a common equivalent for a pump, and need not be described. Other features specified were that the suction device be connected with the head as well as with the buck; that the spray be deliverable from the buck as well as from the head; that the suction device be connected with the chamber which distributed the steam spray of the buck; and the steam ejector be operable only when the suction was applied. The advantages of the Spencer arrangement were that only one source of power was needed, since the suction was supplied by the same steam line that supplied the heat and spray; the power for the suction was not wasted, because it was applied only when the suction was used; the suction served to dry the distributing chamber for the spray, since it was applied through that chamber; and finally the machine could be used for general utility purposes since it provided for spraying from the buck as well as from the head.

This combination of serviceable features seems to me the result of good judgment and ordinary skill rather than invention, and there is no historical argument to the contrary, as in the case of Weinberger. Cer-

tainly I am not so convinced of the validity of the patent as to justify a refusal to follow the decision of the Third Circuit on that point. The question is a fairly close one, as is shown by the divergent views of those who have considered it. The original Patent Examiner, the District Judge in the prior litigation, and the majority of the Circuit Court of Appeals, all found invention to be lacking, whereas the board of three Examiners in Chief and the dissenting Circuit Judge thought otherwise. Comity and the desirability of uniformity require this court to follow the prior decision, in the absence of a firm conviction of error, which is impossible in regard to the Spencer patent.

Settle decree accordingly, and indicate which of the proposed findings already submitted are objected to as not conforming to this memorandum.